**EXHIBIT 2**

TO INITIATING DOCUMENT

NOTICE OF REMOVAL

**COMPLAINT**

CJ-2026-6388
Dishman

*1066317947*

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

ANTHONY TRUPIA,

Plaintiff,

v.

Case No. ____________

CJ- 2026 - 6388

SENTRY CREDIT, INC.;
TRUEACCORD CORP.;
KATIE NEILL;
MARK RAVANESI;
TINKER FEDERAL CREDIT UNION;
DAVE WILLIS;
AT&T INC. d/b/a AT&T U-VERSE; and
JOHN DOE d/b/a [DATA VENDOR],

Defendants.

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

AUG 10 2026

RICK WARREN
COURT CLERK
36____________

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**NATURE OF THE ACTION**

1. This action arises from a campaign of seventeen automated debt-collection text messages Defendants sent to Plaintiff's private cellular telephone between May 27 and July 25, 2026, demanding payment of a debt Plaintiff does not owe and has never owed — a debt belonging to a different person — and exposing that stranger's account information to Plaintiff, seventeen times, through web links that opened his account page with no authentication of any kind.

2. Congress described this case when it wrote the Fair Debt Collection Practices Act. The House Report states: "This bill also protects people who do not owe money at all. In the collector's zeal, collection effort are often aimed at the wrong person either because of mistaken identity or mistaken facts." H.R. Rep. No. 95-131, at 8

(1977). The Senate Report identifies among the Act's purposes preventing debt collectors from "dunning the wrong person." S. Rep. No. 95-382, at 4 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1699. An earlier House Report adds: "Certainly a person who has a common name and is being hounded by a debt collector because of the debts of another person deserves the protection this legislation will offer." H.R. Rep. No. 94-1202, at 5 (1976). Plaintiff's case is not an edge case under this statute; it is the paradigm Congress named.

3. When Plaintiff delivered formal written notice of the campaign to Defendants through their own official channels on July 29, 2026, their response revealed a second wrong: TrueAccord admitted in writing that it had been collecting an AT&T U-Verse account in Plaintiff's own name — a collection Plaintiff learned of only from that response, never having received a single communication or any validation notice about the account. A TrueAccord supervisor then admitted on a recorded call that TrueAccord had called and texted Plaintiff's number, while every channel through which Plaintiff sought answers was closed in his face. Because the account attributed to Plaintiff was collected without any communication ever reaching Plaintiff, Plaintiff alleges that Sentry and TrueAccord transmitted his own name, account, and balance to strangers, exactly as they delivered a stranger's account to him.

4. Each of these contacts, and each of these exposures, intruded upon Plaintiff's solitude, seclusion, and private affairs. That intrusion — the unwanted invasion of a person's peace and quiet by a stranger demanding money he does not owe — is

the harm at the center of this action, and it is a harm the common law has recognized for over a century. Every claim pleaded below is a statutory or common-law expression of it.

5. Plaintiff brings claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., and its implementing Regulation F, 12 C.F.R. part 1006; the Telephone Consumer Protection Act, 47 U.S.C. § 227(b); and the Oklahoma common-law tort of invasion of privacy by intrusion upon seclusion.

**JURISDICTION AND VENUE**

6. This action is properly brought in the District Court of Oklahoma County, State of Oklahoma, a court of general jurisdiction. Under Article 7, Section 7(a) of the Oklahoma Constitution, the District Court has unlimited original jurisdiction of all justiciable matters, including each of the claims asserted here.

7. This Court has jurisdiction over Plaintiff's federal claims. Congress made the courts of the several states courts of competent jurisdiction for private actions under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(d) (authorizing suit "in any other court of competent jurisdiction"), and the state courts have concurrent jurisdiction over private actions under the Telephone Consumer Protection Act, 47 U.S.C. § 227. This Court has jurisdiction over Plaintiff's Oklahoma common-law claim as well.

8. This Court has personal jurisdiction over each Defendant. Oklahoma's long-arm statute permits a court of this state to "exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States." 12

O.S. § 2004(F). Each of the seventeen text messages was transmitted to, and received by, Plaintiff on his Oklahoma cellular telephone bearing an Oklahoma (405) area code, while Plaintiff was physically present in Oklahoma. Those messages are themselves the conduct on which this action is founded; the message directed into the forum is both the forum contact and the gravamen of the claim, leaving no gap between the contact and the cause of action. Each Defendant purposefully directed its conduct at Oklahoma by sending, causing, or authorizing collection text messages to a telephone number it knew or should have known was assigned to the Oklahoma City calling area. Defendant AT&T conducts business throughout Oklahoma and placed for collection, with a collector whose business is automated dunning, an alleged account bearing the name of Plaintiff, an Oklahoma resident — collection activity directed at an Oklahoma consumer's account, from which Plaintiff's claims against AT&T arise.

9. Venue is proper in Oklahoma County. A substantial part of the events giving rise to the claims — Plaintiff's receipt of each of the seventeen text messages — occurred in Oklahoma County, where Plaintiff resides. Defendant Tinker Federal Credit Union conducts business in Oklahoma County, and the foreign-corporation and nonresident Defendants are subject to suit here under 12 O.S. § 137, including in any county where a codefendant may properly be sued. See also 12 O.S. § 139.

## PARTIES

10. Plaintiff Anthony Trupia is a natural person residing in Oklahoma City, Oklahoma County, Oklahoma, and appears pro se.

11. Defendant Sentry Credit, Inc. ("Sentry") is a Washington corporation with its principal place of business at 2809 Grand Avenue, Everett, Washington. Sentry is a "debt collector" within each of the two independent definitions of 15 U.S.C. § 1692a(6): the principal purpose of Sentry's business is the collection of debts, and Sentry regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Sentry's own website describes its business as the collection of past-due accounts "placed with our office for collection," and TrueAccord's corporate homepage describes Sentry as the subsidiary through which TrueAccord's first-party recovery services are "Offered."

12. Defendant TrueAccord Corp. ("TrueAccord") is a corporation with its principal place of business at 16011 College Boulevard, Suite 130, Lenexa, Kansas. TrueAccord acquired Sentry in or about May 2025 and operates the automated, machine-learning collection platform through which the communications at issue were generated and sent. TrueAccord describes itself, on its own website, as "a full-service digital-first debt collection agency" working "25+ million accounts daily." TrueAccord is a "debt collector" within each of the two independent definitions of 15 U.S.C. § 1692a(6): the principal purpose of its business is the collection of debts, and it regularly collects or attempts to collect debts owed or due or asserted to be owed or due another.

13. Defendant Katie Neill is the Chief Compliance Officer of both Sentry and TrueAccord. Neill is herself a "debt collector" within 15 U.S.C. § 1692a(6): she is a senior officer of two businesses whose principal purpose is the collection of

debts, and in that role she regularly participates, directly and indirectly, in the collection of debts owed or due another. Neill exercises supervisory authority over the collection operations of both entities; the compliance function she heads is the function responsible for the practices and procedures at issue in this action. She is intimately involved with the practices and procedures of both entities: the published policies that govern how Sentry and TrueAccord text consumers — including the SMS terms stating that texts go to whatever number the creditor's placement file supplies, the "WRONG NUMBER" reply workflow for consumers wrongly contacted, and the published position that a recipient who does not opt out has thereby given "permission" to be texted — are compliance policies of the kind promulgated, maintained, and enforced by the office she holds at both companies. And she developed or implemented, or both, the specific collection practices at issue here: the texting of vendor- and placement-file-supplied telephone numbers without verification that the number belongs to the intended debtor; the omission of any reassigned-number database check; and the transmission of tokenized hyperlinks that open a consumer's account page without authentication. Neill took no step to stop those practices after years of written consumer complaints, and they continued unchanged through the campaign against Plaintiff. She is sued in her individual capacity. Direct contact between Neill and Plaintiff is not an element of her liability and is not alleged.

14. Defendant Mark Ravanesi is the Chief Executive Officer of TrueAccord. Ravanesi is himself a "debt collector" within 15 U.S.C. § 1692a(6): he is the most senior

officer of a business whose principal purpose is the collection of debts, and in that role he regularly participates, directly and indirectly, in the collection of debts owed or due another. Ravanesi exercises supervisory authority over TrueAccord's entire collection operation. He is intimately involved with its practices and procedures: the automated collection platform is not an incidental tool of TrueAccord's business but its core product and defining feature — TrueAccord markets the platform, its "HeartBeat" machine-learning engine, and its digital-first collection model as the company itself — and the executive who runs the company runs the platform. And he developed or implemented, or both, the specific collection practices at issue here: the operation of an engine that generates and sequences automated dunning communications across an account population; the transmission of collection texts to placement-file numbers without verification; the tokenized unauthenticated link architecture; and the practice of sending machine-generated messages over a roster of published fictitious "Automated Staff" sender names. He is sued in his individual capacity. Direct contact between Ravanesi and Plaintiff is not an element of his liability and is not alleged.

15. Defendant Tinker Federal Credit Union ("Tinker") is a federally chartered credit union with offices in Oklahoma, including in Oklahoma County. Tinker is the creditor identified in each of the seventeen text messages at issue and placed the account — including the telephone number used — for collection. Tinker is not alleged to be a debt collector; it is sued as the creditor on whose behalf the

automated campaign was conducted (Count XI) and as a participant in and principal of the intrusion alleged in Count XII.

16. Defendant Dave Willis is the President and Chief Executive Officer of Tinker. Willis directs and is responsible for Tinker's placement of accounts, and the contact information accompanying them, for collection. He is sued in his individual capacity on Count XII only.

17. Defendant AT&T Inc., doing business as AT&T U-Verse ("AT&T"), is a Delaware corporation with its principal place of business in Dallas, Texas, and conducts business throughout Oklahoma. AT&T is the creditor of the alleged AT&T U-Verse account in Plaintiff's name that TrueAccord admitted holding and collecting, and to which TrueAccord stated in writing that it had "transferred [the] account back." AT&T is not alleged to be a debt collector; it is sued on Count XII only. The precise AT&T operating entity holding the account is known to Defendants and not yet to Plaintiff; Plaintiff will amend to name that entity should it differ.

18. Defendant John Doe (the "Data Vendor") is an unidentified person or entity that supplied Defendants the telephone number used to contact Plaintiff. Sentry has admitted in writing that the number it texts in circumstances like these is "provided to us from a data vendor." The Data Vendor is sued on Count XII only. Plaintiff will amend to name the Data Vendor once its identity is ascertained through discovery.

19. At all relevant times each Defendant acted by and through its agents, employees, officers, and vendors, within the scope of that agency. TrueAccord and Sentry are each responsible for the other's conduct as platform operator and subsidiary: the messages at issue were sent in Sentry's name and generated and transmitted through TrueAccord's platform, and TrueAccord, itself a debt collector, is vicariously liable for the collection conduct of its subsidiary and agent Sentry. In holding and collecting the AT&T U-Verse account described below, TrueAccord acted as AT&T's collection agent. Defendants Katie Neill and Mark Ravanesi (the "Individual Defendants") are each sued in their individual capacities on the facts alleged at paragraphs 13 and 14.

## FACTUAL ALLEGATIONS

### *A. The Text-Message Campaign*

20. Plaintiff is the subscriber to and sole user of cellular telephone number (405) 413-9399 ("Plaintiff's Number"), an Oklahoma number he has held for more than one year and uses for ordinary personal purposes.

21. Between May 27, 2026 and July 25, 2026 — a span of forty-six days — Defendants sent Plaintiff seventeen unsolicited text messages, each transmitted from the same telephone number, (425) 740-0052, and each concerning an alleged debt owed to Tinker Federal Credit Union.

22. The first message, received May 27, 2026 at 12:40 p.m., read in its entirety: "Sentry Credit (Debt Collector): options for your Tinker Federal Credit Union balance at https://sentry.avtal.com/al/keo1Oblz Reply STOP to opt out."

23. A later message, received July 1, 2026, read: "Sentry Credit (debt collector). Offer to clear your Tinker Federal Credit Union balance for $70.94 at https://sentry.avtal.com/al/lC73GF3B Reply STOP to opt out." The messages identified the alleged balance as $109.13 and offered to settle it for $70.94.

24. Each message announced its subject as debt collection on its face. Every message identified its sender as "Sentry Credit (Debt Collector)" — the word "collector"; every message named a creditor, Tinker Federal Credit Union; every message referenced a "balance" — a money obligation; and the messages stated dollar figures ($109.13; $70.94) and offered to "clear your … balance" — payment. No inference was required of any recipient: each message conveyed, expressly, that it related to the collection of a debt.

25. The seventeen messages were materially identical in form, varying only in their settlement language and the web address embedded in each. Plaintiff has preserved a dated screenshot of each of the seventeen messages, recording the date, time, and embedded link of every one.

***B. Plaintiff Is Not the Debtor and Never Consented***

26. The account the messages sought to collect belongs to a person identified on Defendants' own payment page as "Everett D." Plaintiff is not that person, has never used that name, and has never held any account with Tinker Federal Credit Union.

27. Plaintiff owes no debt to Sentry, to TrueAccord, or to Tinker, and has never had any relationship of any kind with any of them. Plaintiff owes no debt to anyone that is in collection.

28. Plaintiff never provided his telephone number to any Defendant, to any creditor in connection with any debt, or to any debt collector or servicer; never consented to be contacted by any Defendant; and never communicated with any Defendant before these messages began.

29. The initial message identified "Sentry Credit (Debt Collector)" but did not state that the communication was an attempt to collect a debt or that any information obtained would be used for that purpose.

***C. The Reassigned or Unverified Number and the Available Database Check***

30. Plaintiff's Number was either reassigned to Plaintiff after being disconnected from a prior subscriber, or was supplied to Defendants as belonging to "Everett D." through purchased or appended data that Defendants never verified. Either way, Plaintiff's Number is not, and was not, associated with Everett D. or with any debt Plaintiff owes.

31. Sentry has admitted in writing, in its published responses to consumer complaints, that it obtains the numbers it texts from a data vendor: "This number was provided to us from a data vendor as a number belonging to the party we were attempting to contact." And both collecting Defendants publish, in materially identical terms, the practice that produced this case. Sentry's SMS Terms of Use state: "We send text messages to the phone number provided by our client, the current creditor, in the

placement file associated with an account in our office for collection." TrueAccord's SMS Terms of Service state, in the same words: "We send text messages to the phone number provided by our client, the current creditor, in the placement file associated with an account in our office for collection." Neither document describes any step to verify that the number in the placement file belongs to the intended debtor, because no such step exists.

32. A complete and accurate database for precisely this purpose was and is available to Defendants. The Federal Communications Commission's Reassigned Numbers Database, administered by Somos, lets a caller confirm whether a number has been disconnected and reassigned; its published fee, in force throughout the relevant period, was $0.008 per query — eight-tenths of one cent — under an entry subscription of $8.00 per month. Comparable commercial tools provide the same function.

33. Federal regulation names that database and conditions a debt collector's text-messaging safe harbor on using it. Regulation F provides a procedures-based defense in connection with text communications only where, among other things, the collector confirmed — no more than sixty days before the message — "using a complete and accurate database," that the telephone number had not been reassigned. 12 C.F.R. § 1006.6(d)(5)(i)(B), (ii)(B); see id. § 1006.6(d)(3). The Federal Communications Commission told this industry the same thing in 2008: where the subscriber has not made the number available to the creditor, it "expect[s] debt collectors to be able to utilize the same methods and resources that

telemarketers have found adequate to determine which numbers are assigned to wireless carriers, and to comply with the TCPA's prohibition." In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991 (ACA International), 23 FCC Rcd 559, ¶ 14 (2008).

34. Had Defendants queried any such database before texting Plaintiff's Number, they would have learned it was not associated with Everett D. or the alleged debt, and none of the seventeen messages would have been sent. Defendants performed no such check, and thereby shifted onto Plaintiff the burden and harm of their own failure to identify their debtor.

***D. The Unauthenticated Payment Portal and Disclosure of a Third Party's Account***

35. The web address embedded in each message did not lead to a login screen or any request for verification. It opened directly to a payment page displaying "Everett D.'s" name, the creditor (Tinker Federal Credit Union), a balance of $109.13, and a settlement figure of $70.94.

36. No password, security question, or identity verification of any kind stood between the link and that information. By sending the link to Plaintiff — a stranger to the account — Defendants disclosed a third party's creditor, balance, and settlement terms to a person with no right to that information, seventeen times.

37. Defendants' own policies describe the opposite design. TrueAccord's published privacy policy states that when a consumer clicks a link in a text "that directs to a linked page with personal identification information, you will be asked to enter identification details in order for the page to display." The public entry point to

Defendants' payment platform likewise requires the user to "[c]hoose a verification method to access your account." And Sentry's own Payment Plan Terms of Service open with a "GENERAL CERTIFICATION": "You certify that you are the obligor on the account Sentry Credit Inc.. is seeking to collect." Sentry's terms thus make the portal obligor-only — yet the tokenized links Defendants texted to Plaintiff opened Everett D.'s account page with no certification, no verification, and no authentication at all. Defendants' own terms set the standard their link architecture bypassed.

38. The defect is not unique to Plaintiff's number. Each tokenized link Defendants transmit to a misidentified recipient exposes another consumer's account the same way, and the number of such disclosures is reflected in Defendants' own transmission records.

*E. The Communications Were Automated*

39. The seventeen messages were made using equipment having the capacity to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator, and to dial such numbers — an automatic telephone dialing system within 47 U.S.C. § 227(a)(1). Among other things, on information and belief, Defendants' platform uses a random or sequential number generator to determine the order in which telephone numbers are selected from the preproduced lists — the placement files and account populations — from which its campaigns are dialed, storing those numbers to be texted or called at times the system determines.

40. What Plaintiff could perceive from his side of the screen bears every mark of that automation. Each message followed a fixed template in which only the creditor name and the dollar figure varied — the signature of programmatic field-substitution, not messages composed by a human being. Each message contained a distinct, tokenized web address (for example, keo1Oblz, RSRK8DZr, BITVDcLg, and lC73GF3B), each generated programmatically and tied to an individual account record. And the seventeen messages issued from a single persistent number over forty-six days on a regular cadence — a volume and regularity consistent only with an automated campaign, not individual manual dialing. The actual configuration of Defendants' dialing and messaging equipment is knowable only from Defendants' own systems and records.

41. Defendants describe their own operation in these terms. TrueAccord — which operates the platform through which Sentry's messages were sent — states in its published patent materials that "the technology generates automated dunning communications (emails, text messages, and self-serve portals)," driven by a machine-learning engine it calls "HeartBeat," which sequences and times collection outreach across the account populations placed with it. Its consumer FAQ states that messages are "sent automatically by our software." Its consumer-facing website promises account management with "no human interaction required." And Sentry's own Payment Plan Terms of Service reserve the right to contact consumers by "SMS (text) messages, pre-recorded/artificial voice or message, automatic telephone dialing system, e-mail, direct drop voicemail, or any

other communication method" — a published reservation of both an automatic telephone dialing system and a prerecorded or artificial voice.

42. Defendants' outbound contact with Plaintiff was not limited to text. A TrueAccord supervisor admitted on a recorded line, "Okay, we called you, yes." (¶ 72.) TrueAccord's own telephone system opens every call with a prerecorded announcement. (¶ 70.) On information and belief, outbound calls placed to Plaintiff's Number, or attempting to reach Plaintiff at a different, wrong number, by or for Defendants used a prerecorded or artificial voice, including prerecorded announcements and direct-drop voicemail of the kind Sentry's published terms expressly reserve; the full inventory of such calls is reflected in Defendants' own transmission records.

*F. The Fictitious Human Senders*

43. TrueAccord publishes a roster of sixteen fictitious "Automated Staff" sender names under which its software transmits collection communications. The messages are generated and sent by machine; the names attached to them present them as the correspondence of individual human beings.

44. Plaintiff's own communications from TrueAccord came from apparent humans named "Lungsim," "Delish," and "Kasif," and its telephone agents identified themselves as "Claudia 1605" and "Sierra." The written responses over different names were canned: the message sent under "Kasif" at 2:22 p.m. on July 30, 2026 repeated, nearly verbatim, the message sent under "Lungsim" at 9:17 a.m. that morning. (¶¶ 62, 68.)

45. The same enterprise that signs its machine-generated messages with human names advertises to the public that its platform requires "no human interaction." A named human sender on a communication represents to its recipient that a person has considered his account. On the facts just described, none had.

### *G. Plaintiff's Number Is on the National Do-Not-Call Registry*

46. Plaintiff's Number has been registered on the National Do-Not-Call Registry since 2005 — a continuous, affirmative, documented expectation of telephonic seclusion maintained for twenty-one years. Plaintiff has retained the registry's confirmation. Plaintiff gave no Defendant consent to contact him and had no established business relationship with any Defendant. Defendants sent all seventeen messages, and placed their calls, to that registered number anyway.

### *H. Defendants Knew: Their Own Written Admissions and the Public Record of Identical Conduct*

47. Defendants' transmission of automated collection texts and emails to people who do not owe the debt is a known, documented, and continuing feature of their operation — not an isolated error. The practice is long-standing. The earliest instance Plaintiff has documented is a Better Business Bureau complaint against TrueAccord dated August 28, 2023 — nearly three years before Defendants first contacted Plaintiff — in which the recipient reported that he "owe[d] no such debt, ha[d] never heard of" the named creditor, and that his "name, and email address ha[d] been given to TrueAccord Corp in error."

48. Sentry itself holds out its Better Business Bureau profile as a credential. Sentry's homepage displays the Better Business Bureau's "Accredited Business" seal,

advertises an "A+" rating, and links the public directly to Sentry's own Better Business Bureau profile. On that very profile — the one Sentry endorses to the public — Sentry has admitted the practice in writing, in its responses to consumer complaints filed against it. Responding on October 25, 2023 to Better Business Bureau complaint no. 20746816, Sentry stated: "We did send an SMS message to [the complainant] in connection with a debt that was assigned to our office but it doesn't belong to [the complainant]. This number was provided to us from a data vendor as a number belonging to the party we were attempting to contact... I appreciate [the complainant] alerting us to the fact that we had the wrong number." Responding on June 5, 2024 to Better Business Bureau complaint no. 21783753, Sentry again admitted pursuing a consumer who owed nothing, confirming that the complainant "does NOT have a balance owing and that this was assigned in error."

49. The Better Business Bureau's public files for Sentry and TrueAccord contain at least fifty-one consumer complaints describing the same conduct — automated texts and emails demanding payment of debts the recipients do not owe — many of them answered by dated written responses from Defendants acknowledging that the recipient was not the account holder. The complaint quoted at paragraph 48 is one of the fifty-one.

50. Defendants themselves hold out their Google reviews as a reliable account of their customers' experience. On its consumer-facing website, TrueAccord tells the public that "Your trust is important to us" and invites them to "Read what our customers have to say on Google Reviews," linking directly to its Google review

page. Those same reviews document the conduct at issue here. Plaintiff has documented four of them, including a reviewer who described receiving a weekend "text message... saying I owe a debt... Finally called this morning and it was not me." The same pattern appears in TrueAccord's reviews on Trustpilot, of which Plaintiff has documented ten, including a reviewer pursued "for some woman named Tawana who owes over 4k in debts... I do not know this person."

51. Beyond acknowledging wrong-person collection case by case, Defendants have designed for it, in public, in their own governing documents — each captured by Plaintiff as it stood on August 8, 2026, in terms whose stated modification dates (February 17, 2025 for TrueAccord's SMS Terms; June 5, 2025 for Sentry's Payment Plan Terms) predate the campaign against Plaintiff:

52. First, both entities publish the placement-file practice quoted at paragraph 31 — texting whatever number the creditor's file supplies, with no verification step described anywhere. Second, TrueAccord's SMS Terms of Service anticipate reaching non-debtors and script the encounter: "If you are not the individual associated with the account, please respond WRONG NUMBER, email support@trueaccord.com, or call our office." Sentry's SMS Terms of Use carry the same instruction. A business that publishes a standing workflow for people wrongly contacted knows that it wrongly contacts people — and has chosen an after-the-fact escape hatch over a before-the-fact verification costing $0.008.

53. Third, TrueAccord's SMS Terms of Service manufacture consent out of silence: "By not opting-out, you give TrueAccord permission to send account related text

messages." Sentry's SMS Terms of Use state the same. Defendants' published position is that a stranger who never asked to be contacted, and never answers, has thereby consented to be contacted. Fourth, the same documents place the burden of number accuracy on the consumer: "You certify, represent and warrant that you are permitted to receive communications at any telephone number you have provided..." — a warranty demanded of recipients by the very enterprise that sources its numbers from creditors' placement files and data vendors without verification. Fifth, Sentry's Payment Plan Terms require the certification quoted at paragraph 37 — "You certify that you are the obligor on the account" — while its texted links open account pages to anyone, with no certification at all.

54. These are published, dated, preserved admissions. Together they establish that wrong-person contact was a known, anticipated, and designed-for feature of Defendants' operation before and during the campaign against Plaintiff.

***I. Defendants Continue the Conduct Because Settling Suits Is Cheaper Than Stopping***

55. Defendants have been sued repeatedly, in courts across the country, for their many improper debt collection methods, and have repeatedly resolved those suits by settlement rather than by changing the practice. The scale of that litigation is reflected in the federal dockets alone, which record at least 395 actions naming TrueAccord Corp. as a defendant and at least 125 actions naming Sentry Credit, Inc. as a defendant. Among them, the public dockets reflect: French v. TrueAccord Corp. (settlement noticed May 1, 2026); Miller v. TrueAccord Corp. (settlement, March 2026); Medina v. TrueAccord Corp. (settled and dismissed, early 2026);

Buckles v. TrueAccord Corp. (settled, January 2026); and Zbikowski v. TrueAccord Corp. (settled, 2025).

56. Plaintiff alleges the existence and cadence of this litigation, drawn from public court records, as evidence of Defendants' knowledge of the practice and their deliberate choice to continue it; Plaintiff does not rely on the terms of any settlement. A pattern of this scale and duration — hundreds of lawsuits over more than a decade, dozens of documented consumer complaints, and Defendants' own repeated written responses acknowledging that they had contacted the wrong person — cannot have escaped, and did not escape, the officers whose duties comprise these functions: Katie Neill, the Chief Compliance Officer of both collecting entities, whose office is responsible for the practices the complaints document, and Mark Ravanesi, TrueAccord's Chief Executive Officer, who runs the operation whose product is the platform. Each supervised, was intimately involved in, and developed or implemented the practices described in this Complaint, and each allowed them to continue unchanged. The pattern shows Defendants have found it more profitable to absorb the cost of settling the few consumers who sue than to abide by the laws that prevent the harms.

***J. The Corporate Structure***

57. Sentry is a subsidiary of TrueAccord, which acquired it in or about May 2025; TrueAccord's own corporate homepage describes its first-party recovery service as "Offered by TrueAccord's subsidiary, Sentry Credit, Inc." TrueAccord operates the automated, machine-learning collection platform through which the messages to

Plaintiff were generated and sent, and directs the practices described above, across "25+ million accounts daily" by its own count. TrueAccord's ultimate parent is TrueML.

### *K. Plaintiff's July 29 Notice Through Defendants' Own Channels — and Sentry's Closed Door*

58. On July 29, 2026, at 10:40 p.m., Plaintiff sent Defendants formal written notice of the conduct described above, attaching a draft complaint, a demand letter, and a package of the supporting evidence. Plaintiff addressed the notice to twelve recipients across Defendants' own published and official channels: TrueAccord's legal, security, privacy, and support addresses; Sentry's compliance, info, and help addresses; Tinker's member-services address; and four attorneys of the Messer Strickler firm who represent TrueAccord in other matters. The full transmission, with delivery-authentication headers intact, is preserved in the electronic-mail chain Plaintiff has retained.

59. Sentry's mail server rejected the notice. Plaintiff's message to help@sentrycredit.com — and to tsmevik@sentrycredit.com, an internal Sentry address to which Sentry's own system routed the notice — bounced with error 550 5.0.350, Sentry's server reporting that an attachment was "of a file type that is NOT allowed by the recipient's organization." The evidence package documenting Sentry's conduct could not pass through Sentry's own front door.

60. TrueAccord received the notice and answered for the enterprise. It opened support ticket no. 7008899 and, in responding, copied "Compliance" at

compliance@sentrycredit.com and "Memberservices" at memberservices@support.tinkerfcu.org — threading TrueAccord, Sentry, and Tinker onto a single ticket about Plaintiff. One platform received Plaintiff's notice, one support system answered it, and all three organizations were joined on the response.

61. From July 29, 2026 forward, each of TrueAccord, Sentry, and Tinker had actual notice, through the channels each holds out to the public, of every violation described in this Complaint.

***L. TrueAccord's Response Reveals an AT&T U-Verse Account in Plaintiff's Own Name***

62. TrueAccord's first substantive response, sent July 30, 2026 at 9:17 a.m. by an agent identified as "Lungsim" on ticket no. 7008899, did not address the seventeen texts, the Everett D. account, or anything else in Plaintiff's notice. Unprompted — Plaintiff had asked nothing about any account of his own, and had never heard of one — it announced a different debt entirely: "We would like to inform you that we are no longer collecting the balance on your account and have transferred your account back to AT&T U-Verse." The message directed Plaintiff to "contact AT&T U-Verse directly if you have further questions regarding the balance" and provided AT&T's telephone number.

63. That response was itself a debt-collection communication by its own terms. It carried TrueAccord's full disclosure: "TrueAccord is a debt collection agency and this is an attempt to collect debt. Any information obtained will be used for that

purpose." A consumer receiving it could reasonably understand it as sent in connection with the collection of the AT&T U-Verse balance it announced.

64. The response was Plaintiff's first notice, from anyone, ever, that an AT&T U-Verse account attributed to him had been placed in collection. To Plaintiff's knowledge, neither TrueAccord nor Sentry has ever sent him notice of any kind concerning the account: before July 30, 2026, no Defendant sent Plaintiff a single communication concerning it — no initial communication, no validation notice, no statement of the amount of the debt, the name of the creditor, or Plaintiff's rights to dispute and verify it — and, in contrast to the seventeen-message campaign Defendants ran on a Tinker account Plaintiff does not owe, Plaintiff has received no text messages or collection outreach of any kind on the account said to be his own. TrueAccord's own written words — "your account," "we are no longer collecting the balance" — admit that it held and collected a debt attributed to Plaintiff while telling Plaintiff nothing.

65. By its statement that it had "transferred your account back to AT&T U-Verse," TrueAccord identified AT&T as the creditor that placed the account for collection and the entity now holding it. AT&T placed with TrueAccord — an automated dunning operation — an alleged account in the name of an Oklahoma consumer, together with whatever contact information accompanied the placement, without notice of any kind ever reaching that consumer.

***M. The Written Stonewalling***

66. On July 30, 2026 at 10:49 a.m., Plaintiff replied with two direct written questions: "What phone number did you have on file for this account, and would you be willing to give me my account records?"

67. At 10:52 a.m., a TrueAccord agent identified as "Delish" declined to answer either question in writing, stating that "[d]ue to the nature of your request, we would like to speak with you directly," and directing Plaintiff to a telephone number. At 11:00 a.m. Plaintiff asked in writing: "Is that a refusal to provide my documentation, or confirmation of the debt, unless I do it verbally, over phone?" No Defendant ever answered that question. At 1:59 p.m., Plaintiff asked again why a phone call was being insisted upon and what its purpose would be.

68. At 2:22 p.m., a TrueAccord agent identified as "Kasif" replied — with the same canned message "Lungsim" had sent five hours earlier, repeated nearly verbatim: "we are no longer collecting the balance on your account and have transferred your account back to AT&T U-Verse," again under the same debt-collection disclosure. Plaintiff's written questions about the telephone number on file and his account records were never answered, in that message or any other. The answers Plaintiff sought — what number Defendants had texted and called on his account, and what his account records showed — are the facts that would document Defendants' wrong-number collection on the AT&T account; withholding them protected an ongoing collection operation from scrutiny while Defendants continued to insist on an unrecorded telephone channel.

***N. The July 30 Telephone Call: Admissions on TrueAccord's Own Recorded Line***

69. On July 30, 2026, Plaintiff placed a call to TrueAccord and, as a party to the call, recorded it, announcing openly that he was recording. Plaintiff has preserved the recording and a transcript of it.

70. The call opened on TrueAccord's automated collection system, with a prerecorded announcement: "This is TrueAccord Corporation. This is to advise you we are attempting to collect a debt and that any information obtained will be used for that purpose. This communication is from a debt collector." The system then announced: "Before we continue, please note that this call is being recorded and may be monitored for quality assurance purposes. By continuing, you are providing consent."

71. A live agent, "Claudia 1605," repeated the recording notice — "This call is being recorded and might be monitored... By continuing you're providing consent" — and, upon learning that Plaintiff was also recording, responded: "In this case, we're not allowed to record. If you don't wish to be recorded, you can reach us by email." Plaintiff informed her that the email channel had produced only automated responses about an unrelated debt, and asked to be escalated.

72. A supervisor, "Sierra," took the call. In response to Plaintiff's statement that TrueAccord had contacted him about a debt that does not belong to him, Sierra admitted: "Okay, we called you, yes." When Plaintiff added that TrueAccord had texted him about a debt that does not belong to him, Sierra admitted: "And we text you to this phone number."

73. Sierra also confirmed TrueAccord's one-sided recording policy as policy: TrueAccord records every caller under its "by continuing you are providing consent" announcement, yet "cannot continue the call" if the consumer records. Plaintiff stated the policy back to her precisely — "you record all calls but also don't communicate if the recording happens on the other side. Is that correct?" — and Sierra answered: "Correct."

74. Sierra then refused to proceed because Plaintiff was recording — "we can't assist you if you're recording the call" — while briefly invoking Plaintiff's failure to submit to "authentication": an identity-verification demand from the same enterprise whose texted links had opened a stranger's account to Plaintiff with no authentication of any kind. Told that the email channel produced only robotic replies about an unrelated debt, Sierra's only direction was back to legal@trueaccord.com — the very loop already demonstrated broken. On that recorded line, Plaintiff gave TrueAccord's supervisor verbal notice of the wrong-person texting, the exposure of a third party's account through the texted links, and the pattern of prior admissions and suits, and asked that TrueAccord's legal department or leadership contact him. None did.

***O. The Mirror: Defendants Sent Plaintiff's Own Information to Strangers***

75. TrueAccord collects by communicating: its platform "generates automated dunning communications (emails, text messages, and self-serve portals)" as a matter of design, and its business responses to the Better Business Bureau confirm that it dunns the contact information "provided to TrueAccord by the current

creditor" as a matter of course. TrueAccord admits it held and collected an AT&T U-Verse account in Plaintiff's name — yet Plaintiff never received one communication about it. On information and belief, the dunning communications on Plaintiff's account — generated and transmitted by Sentry and TrueAccord through the collection platform they share (¶¶ 19, 57), on the account and contact information AT&T placed — were in fact sent, and were delivered to contact points that do not belong to Plaintiff: to strangers. Those transmissions occurred; their dates, channels, and recipients are recorded in Defendants' own send logs.

76. TrueAccord's own public record documents precisely this failure mode, on AT&T accounts specifically, in the months immediately before these events. As reflected in TrueAccord's written responses to a Better Business Bureau complaint dated April 6, 2026, a consumer who had "never had AT&T U-Verse" reported receiving TrueAccord's emails demanding payment of an AT&T U-Verse balance; TrueAccord answered that "the contact information for this account was provided to TrueAccord by the current creditor" and, "[s]ince [the consumer] has advised us that they are not the account holder, we will not contact them about this account again." As reflected in TrueAccord's written response to a Better Business Bureau complaint dated February 18, 2026, another consumer reported being dunned for an AT&T Mobility account she never held, at an Ohio address where she never lived; TrueAccord again answered that the contact information "was provided to TrueAccord by the current creditor" and unsubscribed her address. In each

instance, TrueAccord's dunning about an AT&T account — bearing the account holder's identifying details — was delivered to a stranger to the account.

77. The exposure runs through the same architecture pleaded above: TrueAccord's automated communications carry the account holder's name, creditor, and balance, and its tokenized links open account pages with no authentication. (¶¶ 35–38.) On information and belief, whoever received the communications concerning Plaintiff's AT&T account received Plaintiff's name, his alleged debt, and access to his account information — exactly as Plaintiff received Everett D.'s.

78. The facts that would identify each transmission — the contact information on the placement file, the send logs, the account records — sit exclusively in the possession of Sentry, TrueAccord, and AT&T. Plaintiff asked for them in writing on July 30, 2026; TrueAccord refused to provide them and refused even to identify the telephone number on its file. (¶¶ 66–68.)

***P. Harm to Plaintiff***

79. Each of the seventeen messages was an intrusion upon Plaintiff's solitude, seclusion, and private affairs — an unwanted invasion, by strangers demanding money he does not owe, of the peace and quiet of the private cellular telephone he carries on his person, in his home, through his days and evenings. Defendants committed that intrusion seventeen separate times over forty-six days, and by telephone calls besides. Each intrusion was highly offensive to a reasonable person: sent without any prior relationship or consent, to a number registered on the National Do-Not-Call Registry for twenty-one years, demanding payment of a

debt Plaintiff does not owe, by an operation that knew its process routinely reaches non-debtors. The repetition compounds the offense; it is not the source of it.

80. The disclosures themselves caused Plaintiff direct harm. Seventeen times, Defendants delivered into Plaintiff's hands the name, creditor, balance, and settlement terms of a stranger — making Plaintiff the involuntary custodian of another person's private financial information he never sought and had no right to hold, with each message renewing the imposition. And on July 30, 2026, Plaintiff learned that his own name and alleged account had been run through the same machinery: that an account bearing his name had been worked by an automated dunning operation, transmitted through unauthenticated architecture, and "transferred back" to a creditor — all without a word to him. The knowledge that his own name, debt, and account information had been broadcast to strangers, exactly as a stranger's had been broadcast to him, was itself a distinct injury, grounded in Defendants' own documented failure mode on AT&T accounts.

81. These intrusions caused Plaintiff emotional distress with physical manifestation: frustration, anger, and anxiety mounting over forty-six days of repeated unwanted contact, and, following the July 29–30 events — the discovery of the account in his own name, the refusals to answer, and the closed channels — heightened anxiety, [CONFIRM WITH TONY BEFORE FILING: specific physical manifestations, e.g., disrupted sleep, headaches, appetite or concentration effects — plead only what is true; a corroborating declaration should be obtained now].

82. Plaintiff's time, attention, and telephone's finite resources were also consumed — in receiving and documenting seventeen messages, in delivering notice through channels Defendants publish and then close, and in pursuing by email and telephone the answers Defendants refused to give. This harm accompanied the intrusions; Plaintiff does not rest on it alone.

83. When Plaintiff asked the questions any consumer would ask — what number do you have on file; may I have my records — every channel Defendants hold out to the public was closed in his face: the bounced mailbox, the robotic replies over rotating fictitious names, the refusal to answer in writing, and the recorded line that "cannot continue" if he records. That course of conduct extended and aggravated every harm above.

***Q. Equitable Tolling and the Equitable Discovery Rule (the AT&T Account)***

84. Plaintiff first learned that an AT&T U-Verse account attributed to him existed, and had been placed in collection, on July 30, 2026, from TrueAccord's own unprompted message. (¶ 62.)

85. Before that date, Plaintiff could not — with any degree of diligence — have discovered any violation arising from the collection of that account, because Defendants directed every communication concerning it, including any initial communication and any validation notice, to contact points that were not Plaintiff's. (¶¶ 64, 75–77.) The concealment was not Plaintiff's doing and was complete: the consumer to whom notice was owed was the one person the

collection never reached. When Plaintiff asked TrueAccord in writing what contact information it had on file, it refused to say. (¶¶ 66–68.)

86. Accordingly, as to all claims arising from the collection of the AT&T account, Plaintiff invokes equitable tolling and the equitable discovery rule: any applicable limitations period did not begin to run, or was tolled, until July 30, 2026, when Defendants' own communication first put Plaintiff on notice. The dates on which the account was placed and first worked are known only to Defendants and will be established in discovery.

## ALLEGATIONS COMMON TO THE FDCPA COUNTS (COUNTS I–X)

87. Sentry and TrueAccord are each a "debt collector" within both independent definitions of 15 U.S.C. § 1692a(6), and Neill and Ravanesi are each individually a "debt collector," as alleged at paragraphs 11 through 14, which are incorporated in each Count below. The alleged Tinker Federal Credit Union obligation is a "debt" within 15 U.S.C. § 1692a(5): a consumer credit-union account arising from a transaction primarily for personal, family, or household purposes. The alleged AT&T U-Verse obligation is likewise a "debt": a residential consumer telecommunications account arising from a transaction primarily for personal, family, or household purposes.

88. Plaintiff may enforce §§ 1692d, 1692e, and 1692f as "any person" aggrieved by Defendants' conduct, under 15 U.S.C. § 1692k(a), which affords a civil action against any debt collector who fails to comply with any provision of the Act "with respect to any person."

89. In the alternative, and as to §§ 1692c and 1692g, Plaintiff is a "consumer" within 15 U.S.C. § 1692a(3), which defines the term as any natural person "obligated or allegedly obligated" to pay any debt. Defendants alleged the Tinker debt against Plaintiff seventeen times, in writing, calling it "your Tinker Federal Credit Union balance"; and TrueAccord alleged the AT&T debt against Plaintiff in writing, calling it "your account" and "the balance on your account." By Defendants' own words, Plaintiff is a person they have alleged owes each debt.

90. Each communication alleged below was made in connection with the collection of a debt: each announced itself as debt collection, named a creditor and a balance, demanded or solicited payment, or carried Defendants' own printed disclosure that "this is an attempt to collect debt" — and a consumer receiving each could reasonably understand it as sent in connection with the collection of a debt.

91. Defendants' conduct alleged in each Count below intruded upon Plaintiff's solitude, seclusion, and private affairs, in the manner alleged at paragraphs 79 through 83, and each such intrusion was highly offensive to a reasonable person. The harm each Count redresses bears a close relationship to the harm remedied by the common-law tort of invasion of privacy by intrusion upon seclusion.

## COUNT I — Fair Debt Collection Practices Act, 15 U.S.C. § 1692d and § 1692d(5) — Harassment and Abuse

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

92. Plaintiff incorporates paragraphs 1 through 91.

93. Defendants engaged in conduct the natural consequence of which is to harass, oppress, and abuse a person in connection with the collection of a debt, in violation of 15 U.S.C. § 1692d: seventeen collection text messages over forty-six days, from one persistent number, demanding payment of a debt Plaintiff does not owe, sent to a private cellular number that had been registered on the National Do-Not-Call Registry for twenty-one years, without consent and without any prior relationship — together with telephone calls to the same number, and continued insistence on contact after Plaintiff's July 29, 2026 written notice. Section 1692d protects "any person"; Plaintiff need not be a consumer to enforce it.

94. Defendants further violated 15 U.S.C. § 1692d(5) by causing Plaintiff's telephone to ring and engaging Plaintiff in telephone conversation — by text and call, seventeen times and more — repeatedly and continuously with intent to annoy, abuse, or harass a person at the called number. The intent is established by Defendants' own records and published documents: they knew their process routinely reaches people who do not owe the debt, published a "WRONG NUMBER" workflow in anticipation of exactly that, declined a verification costing $0.008 per query, and let an automated engine drive a forty-six-day cadence at a registered number regardless.

95. The natural consequence of that course of conduct — a stranger's debt, demanded again and again, at a number its holder had affirmatively sequestered from unsolicited calling for two decades — was to harass, oppress, and abuse. It also intruded, seventeen times, upon Plaintiff's solitude and seclusion. (¶¶ 79–83, 91.)

96. Plaintiff is entitled to actual damages, statutory damages up to $1,000, and costs under 15 U.S.C. § 1692k. In setting statutory damages, the Court weighs "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional," 15 U.S.C. § 1692k(b)(1): here, seventeen violations over forty-six days (frequency and persistence), wrong-person collection with third-party data exposure at a Do-Not-Call-registered number (nature), and years of written admissions, published workflows for wrongly-contacted consumers, and a declined $0.008 check (intentionality).

**COUNT II — Fair Debt Collection Practices Act, 15 U.S.C. § 1692c(b) — Disclosure of Everett D.'s Account to Plaintiff**

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

97. Plaintiff incorporates paragraphs 1 through 91.

98. Each of the seventeen messages, and each linked account page, was a "communication" within 15 U.S.C. § 1692a(2): each conveyed information regarding a debt directly to its recipient, identifying a debt collector ("Sentry Credit (Debt Collector)"), a creditor (Tinker Federal Credit Union), a "balance" ($109.13), a settlement figure ($70.94), and an offer to "clear your … balance" — and each linked page displayed Everett D.'s name, creditor, balance, and settlement terms. (¶¶ 22–24, 35–36.)

99. Sentry and TrueAccord violated 15 U.S.C. § 1692c(b) by communicating information about the alleged debt of "Everett D." — the consumer, if that debt

was his — to Plaintiff, a person other than the consumer and other than any person enumerated in § 1692c(b), without the consumer's consent given directly to the debt collector and without the express permission of a court: Sentry sent each message in its name; TrueAccord's platform generated and transmitted each message and served each linked page, which opened directly onto Everett D.'s account with no authentication, seventeen times. Section 1692c(b) contains no intent element, and Defendants' own published terms — anticipating "WRONG NUMBER" recipients — establish that disclosure to unintended recipients was, at minimum, fully anticipated.

100. No statutory safe harbor applies. The communications were not made "for the purpose of acquiring location information" under 15 U.S.C. § 1692b — Defendants sought no location information, did not identify the calls or texts as confirming or correcting location information, and instead named the debt and demanded payment.

101. The disclosures themselves caused Plaintiff direct harm and actual damages: each delivery of a stranger's financial information intruded upon Plaintiff's seclusion and private affairs; each made him the involuntary custodian of information he had no right to hold and no way to return; and the seventeen repetitions consumed his time and attention and caused him the distress alleged at paragraphs 79 through 83. Plaintiff pleads these harms as flowing from the disclosures specifically, not only from the campaign at large.

102. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors pleaded at paragraph 96, and costs under 15 U.S.C. § 1692k. This Count proceeds on the premise that the alleged Tinker debt was Everett D.'s and Plaintiff was a stranger to it; Count IX pleads the alternative premise. Plaintiff pleads both in the alternative, as he is entitled to do.

## COUNT III — Fair Debt Collection Practices Act, 15 U.S.C. § 1692c(b) — Disclosure of Plaintiff's Account to Strangers

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

103. Plaintiff incorporates paragraphs 1 through 91.

104. As to the alleged AT&T U-Verse debt, Plaintiff is the consumer: it is the account Defendants attributed to him in writing. (¶¶ 62–64, 89.)

105. Sentry and TrueAccord violated 15 U.S.C. § 1692c(b) by transmitting communications concerning Plaintiff's alleged AT&T U-Verse debt — dunning communications bearing Plaintiff's name, account, and balance, generated through the platform and unauthenticated architecture described at paragraphs 35 through 38 and 75 through 77 — to third parties who are strangers to the account, without Plaintiff's consent given directly to the debt collector and without the express permission of a court. Those disclosures occurred: TrueAccord's platform collects only by communicating; it admits it held and collected the account; no communication ever reached Plaintiff; and TrueAccord's own written responses document this exact failure mode on AT&T accounts in the months immediately

preceding. (¶¶ 75–77.) The dates, channels, and recipients of each transmission are recorded in Defendants' own send logs.

106. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k. This Count is pleaded separately from Count II so that each disclosure theory stands on its own footing.

## COUNT IV — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(2)(A) and § 1692e(10) — False Representation of the Character, Amount, and Legal Status of the Debt

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

107. Plaintiff incorporates paragraphs 1 through 91.

108. Sentry and TrueAccord violated 15 U.S.C. § 1692e(2)(A), and used a false representation and deceptive means in violation of § 1692e(10), by falsely representing the character, amount, and legal status of the alleged debt: seventeen written statements that the Tinker Federal Credit Union balance was "your … balance" — Plaintiff's — when Plaintiff owed nothing, has never held any Tinker account, and is a stranger to the debt. (¶¶ 22–27.)

109. The representation was material and false in the most fundamental way a collection representation can be: it asserted the existence of a legal obligation where none exists. To the least sophisticated consumer — the objective standard, protecting the gullible as well as the shrewd — a text message arriving on his own telephone, from a self-identified debt collector, describing "your Tinker Federal Credit Union balance" and offering to let him "clear your … balance for $70.94,"

states that he is legally obligated to pay that balance. That is what these messages told Plaintiff, seventeen times, and it was false each time. That Plaintiff himself investigated rather than paid does not cure the falsity; the standard is objective, and the Act protects the recipient who would have paid a debt he did not owe.

110. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k.

## COUNT V — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(9) and § 1692e(14) — False Impression as to Source; Use of a Name Other Than the True Name

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

111. Plaintiff incorporates paragraphs 1 through 91.

112. Every one of the seventeen messages identified its sender as "Sentry Credit (Debt Collector)" and no one else. TrueAccord — the entity that operates the platform, generated each message, transmitted each message, and served each linked page (¶¶ 12, 19, 41, 57) — appeared nowhere on any of them. The recipient of these communications was never told that the actual generator and transmitter of the campaign was TrueAccord, operating through a subsidiary's name.

113. TrueAccord thereby used, in connection with the collection of a debt, a business, company, or organization name other than the true name of its business, in violation of 15 U.S.C. § 1692e(14); and Defendants used a written communication that creates a false impression as to its source and authorization, in violation of 15 U.S.C. § 1692e(9), because each message presented itself as the correspondence of Sentry alone while concealing the enterprise actually conducting the collection.

Where a communication discloses both the principal and the agent, a consumer knows who is collecting; these messages disclosed neither the operator nor the relationship, and so concealed the true source of the campaign.

114. The concealment deprived Plaintiff of the identity of the entity actually processing his number and the stranger's account data — information he needed on July 29–30 and could not get (¶¶ 66–68) — and each concealed-source message was one of the intrusions alleged at paragraphs 79 through 83. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k.

## COUNT VI — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(10) — Fictitious Human Sender Names on Machine-Generated Communications

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

115. Plaintiff incorporates paragraphs 1 through 91. This Count rests on conduct distinct from every other Count: the practice of attaching fictitious or functionally fictitious human sender names to machine-generated collection communications.

116. TrueAccord publishes sixteen fictitious "Automated Staff" sender names under which its software transmits collection communications; its FAQ states messages are "sent automatically by our software"; and its consumer site advertises "no human interaction required." Plaintiff's communications arrived over the names "Lungsim," "Delish," and "Kasif" — apparent individual human correspondents — and the "agents" repeated identical canned text over different names hours apart. (¶¶ 43–45, 62, 67–68.)

117. A human name on a collection communication represents to the least sophisticated consumer that an identifiable person has reviewed his account and formed a judgment about it. Where the communication is generated, sequenced, and sent by software, and no person has considered the account, that representation is false. Defendants thereby used a false representation and deceptive means to collect or attempt to collect a debt and to obtain information concerning a consumer, in violation of 15 U.S.C. § 1692e(10). No mass-communication technique, however efficient, is permitted if it is deceptive; automation is the admission here, not the defense.

118. The deception was material: it induced Plaintiff to spend July 29–30 attempting to reason with what appeared to be human correspondents who could read his notice and answer his questions, when the channel was in fact scripted software rotating names — prolonging the intrusion and the futile consumption of his time alleged at paragraphs 79 through 83. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k.

## COUNT VII — Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(11) — Failure to Disclose in the Initial Communication

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

119. Plaintiff incorporates paragraphs 1 through 91.

120. The initial communication — the May 27, 2026 text — identified "Sentry Credit (Debt Collector)" but failed to disclose that the communication was an attempt to

collect a debt and that any information obtained would be used for that purpose, in violation of 15 U.S.C. § 1692e(11). (¶¶ 22, 29.) On information and belief, the omission was not an accident but the uniform product of Defendants' message template: no message in the campaign carried the required statement, and a deliberate template choice to omit a mandated disclosure is by definition not unintentional.

121. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k.

**COUNT VIII — Fair Debt Collection Practices Act, 15 U.S.C. § 1692f and § 1692f(1) — Unfair and Unconscionable Means; Collection of an Amount Not Owed**

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

122. Plaintiff incorporates paragraphs 1 through 91.

123. Sentry and TrueAccord violated 15 U.S.C. § 1692f(1) by collecting and attempting to collect amounts — $109.13, and $70.94 in settlement of it — that were not expressly authorized by any agreement creating the debt and are not permitted by law. The statutory question is whether the amount sought was permitted, and it was not: Plaintiff has no agreement with Sentry, TrueAccord, Tinker, or anyone else creating the alleged debt, and no Oklahoma law permits collecting any amount from a stranger to a debt. Every dollar demanded of Plaintiff was unauthorized in its entirety.

124. Defendants further violated 15 U.S.C. § 1692f by using unfair and unconscionable means to collect and attempt to collect debts, including: (a) running an automated

seventeen-message campaign against a number never verified as the debtor's, while declining a verification database costing $0.008 per query that federal regulation names for exactly this purpose (¶¶ 30–34); (b) transmitting tokenized links that expose account data to whoever holds the number, contrary to their own published obligor-only terms (¶¶ 35–38); (c) after receiving Plaintiff's formal written notice, answering with canned collection messages about a different debt, refusing to answer Plaintiff's direct written questions — what telephone number was on file, and whether he could have his account records — and insisting on an unrecorded telephone channel under a one-sided recording policy in which TrueAccord records every consumer but "cannot continue" any call the consumer records (¶¶ 62–74); and (d) thereby channeling a consumer away from the written communication that documents a collector's conduct and preserves a consumer's statutory rights.

125. The post-notice conduct was itself in connection with the collection of debts: TrueAccord's responses carried its own collection disclosure; the unprompted announcement of the AT&T account was a collection communication about that account (¶¶ 62–63); and the refusals served an ongoing collection operation by withholding the facts that would document its wrong-number collection (¶ 68). A consumer receiving those communications could reasonably understand each as sent in connection with debt collection — they said so on their face.

126. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k.

**COUNT IX — Fair Debt Collection Practices Act, 15 U.S.C. § 1692g(a) — No Validation Notice on the Tinker Campaign (Pleaded in the Alternative to Count II)**

*(Against Sentry Credit, TrueAccord, Katie Neill, and Mark Ravanesi)*

127. Plaintiff incorporates paragraphs 1 through 91. This Count is pleaded in the alternative to Count II: Count II proceeds on the premise that the alleged Tinker debt was Everett D.'s and Plaintiff a stranger to it; this Count proceeds on the premise — supplied by Defendants' own words — that Defendants alleged the debt against Plaintiff himself.

128. Defendants told Plaintiff, seventeen times, in writing, that the Tinker Federal Credit Union balance was his: "your Tinker Federal Credit Union balance"; "clear your Tinker Federal Credit Union balance for $70.94." A person a debt collector alleges to owe a debt is a "consumer" as to that debt under 15 U.S.C. § 1692a(3) ("obligated or allegedly obligated"). On this Count's premise, Plaintiff was the consumer, and the May 27, 2026 text was the initial communication with him in connection with the collection of that debt.

129. Within five days of that initial communication, Sentry and TrueAccord were required to send Plaintiff a written notice containing the amount of the debt; the name of the creditor; and the statements of his thirty-day right to dispute, his right to obtain verification, and his right to the name and address of the original creditor. 15 U.S.C. § 1692g(a)(1)–(5); see 12 C.F.R. § 1006.34. They sent nothing — not within five days, and not ever, across a forty-six-day, seventeen-message campaign. The violation is not that a notice was buried or overshadowed; it is that no notice of any kind was ever sent.

130. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k. Either the alleged debt was Everett D.'s — in which case the seventeen disclosures to Plaintiff violated § 1692c(b) (Count II) — or Defendants alleged it against Plaintiff — in which case he was owed this notice and never received it. Defendants' answer to one Count concedes an element of the other.

**COUNT X — Fair Debt Collection Practices Act, 15 U.S.C. § 1692g(a) — No Validation Notice on the AT&T Account**

*(Against TrueAccord, Katie Neill, and Mark Ravanesi)*

131. Plaintiff incorporates paragraphs 1 through 91.

132. TrueAccord held and collected an alleged AT&T U-Verse debt attributed to Plaintiff — "your account," "the balance on your account," in its own written words — making Plaintiff the consumer as to that debt under 15 U.S.C. § 1692a(3). (¶¶ 62–65, 89.)

133. TrueAccord violated 15 U.S.C. § 1692g(a) by collecting that debt without ever providing Plaintiff the written validation notice the Act requires — the amount of the debt, the name of the creditor, and the statements of Plaintiff's rights to dispute the debt and obtain verification — within five days of its initial communication concerning the account or at any time. On information and belief, TrueAccord directed its collection communications on the account, including any validation notice, to contact points that were not Plaintiff's (¶¶ 75–77), so that the one person to whom the notice was owed never received it. Regulation F, 12 C.F.R. §

1006.34, prescribes the validation information a debt collector must provide the consumer; TrueAccord provided Plaintiff none of it. A validation notice sent to someone other than the consumer is not a validation notice to the consumer.

134. The dates on which the AT&T account was placed and first worked are known only to Defendants. Whatever those dates prove to be, the limitations allegations at paragraphs 84 through 86 apply to this Count in full: Plaintiff could not have discovered the violation before July 30, 2026, because TrueAccord directed every communication about the account away from him, and any applicable period was tolled until that date under equitable tolling and the equitable discovery rule.

135. Plaintiff is entitled to actual damages, statutory damages up to $1,000 assessed under the § 1692k(b)(1) factors, and costs under 15 U.S.C. § 1692k.

**COUNT XI — Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A)(iii) — Automatic Telephone Dialing System and Prerecorded or Artificial Voice**

*(Against Sentry Credit, TrueAccord, Katie Neill, Mark Ravanesi, and Tinker Federal Credit Union)*

136. Plaintiff incorporates paragraphs 1 through 91.

137. Section 227(b)(1)(A)(iii) prohibits any call to a cellular telephone number "using any automatic telephone dialing system or an artificial or prerecorded voice" without the prior express consent of the called party. The two prohibitions are independent; a violation of either suffices. And the prohibition applies to any such call regardless of the content of the call — the Federal Communications Commission has held expressly that it "is not limited only to calls that constitute 'telephone solicitations,'" and that debt-collection content provides no exemption

from § 227(b). In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991 (ACA International), 23 FCC Rcd 559, ¶ 11 (2008).

138. The ATDS prong. Each of the seventeen text messages was made to Plaintiff's cellular telephone number using an automatic telephone dialing system: equipment with the capacity to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator, and to dial such numbers, as alleged at paragraphs 39 through 41 — including, on information and belief, the use of a random or sequential number generator to determine the order in which numbers are selected from the preproduced account lists Defendants' campaigns dial. The perceivable indicia of that automation — the fixed template, the programmatically tokenized links, the single persistent number, the regular forty-six-day cadence, and Defendants' own published descriptions of a machine-learning engine that "generates automated dunning communications" — are pleaded at paragraphs 40 and 41; the system's actual configuration is recorded in Defendants' own systems and is a matter for discovery.

139. The prerecorded or artificial voice prong, in the alternative and independently. Defendants also placed telephone calls to Plaintiff's Number — "Okay, we called you, yes," their own supervisor admitted on a recorded line (¶ 72) — and, on information and belief, those outbound calls used a prerecorded or artificial voice: TrueAccord's own telephone system opens with a prerecorded announcement (¶ 70), and Sentry's published terms expressly reserve contact by "pre-

recorded/artificial voice or message" and "direct drop voicemail" (¶ 41). A call using a prerecorded or artificial voice violates § 227(b)(1)(A)(iii) without regard to how it was dialed; this prong involves no ATDS element at all. The full inventory of such calls is reflected in Defendants' transmission records.

140. No consent. The messages and calls were made without Plaintiff's prior express consent. The consent the FCC recognizes for collection calls to wireless numbers is consent evidenced by the consumer having "provided [the number] to a creditor in connection with an existing debt." ACA International, 23 FCC Rcd 559, ¶ 9. Plaintiff provided his number to no creditor, no collector, and no Defendant, in connection with any debt or otherwise (¶ 28); the number came to Defendants from a creditor's placement file or a data vendor, unverified (¶¶ 30–31). Consent cannot be manufactured from silence — Defendants' published position that "[b]y not opting-out, you give TrueAccord permission" inverts the statute, under which consent must exist before the call and the burden of demonstrating it rests on the calling side. Id. ¶ 10. And whatever consent Everett D. may once have given anyone attached to Everett D., not to Plaintiff: the called party whose consent matters is the current subscriber of the number called, and Plaintiff — the current subscriber — consented to nothing. The statutory violation is complete upon the making of each call or message, whether or not answered.

141. Tinker's vicarious liability. Tinker is the creditor on whose behalf every one of the seventeen messages was sent — each named "your Tinker Federal Credit Union balance" — and it placed the account and telephone number for collection. Under

the FCC's controlling construction, "a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call." ACA International, 23 FCC Rcd 559, ¶ 10. Tinker is liable for the campaign conducted in its name accordingly.

142. The Individual Defendants. Neill and Ravanesi directly participated in and personally authorized the automated calling and texting practices at issue, as alleged at paragraphs 13, 14, and 56: they developed or implemented the platform, the placement-file dialing practice, and the compliance policies under which the campaign ran. An officer who directly participates in or personally authorizes the violative calling practice is personally liable under the TCPA without regard to the corporate form.

143. Each of the seventeen messages, and each qualifying call, is a separate violation of 47 U.S.C. § 227(b)(1)(A)(iii), entitling Plaintiff to $500 in statutory damages per violation under 47 U.S.C. § 227(b)(3). Defendants' violations were willful and knowing: they knew their process routinely reaches persons who do not owe the debt, admitted it in writing, published a workflow for it, were repeatedly sued for it, and declined the inexpensive number verification that two federal regulators directed at this industry (¶¶ 30–34, 47–56); and from July 29–30, 2026, Sentry, TrueAccord, and Tinker each had actual notice through Plaintiff's written notice, TrueAccord's own ticket joining all three organizations, and Plaintiff's verbal

notice to a TrueAccord supervisor on TrueAccord's recorded line (¶¶ 58–74). Plaintiff is therefore entitled to treble damages of up to $1,500 per violation under 47 U.S.C. § 227(b)(3).

**COUNT XII — Invasion of Privacy — Intrusion Upon Seclusion**
*(Against All Defendants)*

144. Plaintiff incorporates paragraphs 1 through 91.

145. Oklahoma recognizes the tort of invasion of privacy by intrusion upon seclusion: one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability if the intrusion would be highly offensive to a reasonable person. Defendants intentionally and without consent intruded upon Plaintiff's solitude and seclusion by sending seventeen automated collection messages, and by placing collection calls, to his private cellular telephone, demanding payment of a debt he does not owe, over forty-six days. (¶¶ 20–29, 79.) Each Defendant played its part: Sentry sent each message in its name; TrueAccord generated and transmitted each through its platform; Neill and Ravanesi developed, implemented, and supervised the practices that produced the campaign (¶¶ 13–14); Tinker placed the account and the number and authorized the campaign as the creditor named in every message; and the Data Vendor supplied the wrong number at which the campaign was aimed, and is responsible with the Defendants who used it.

146. Each intrusion was highly offensive to a reasonable person, and Defendants repeated it seventeen times and more: each contact was made without consent or

any relationship, to a number registered on the Do-Not-Call Registry for twenty-one years — a standing, documented assertion of telephonic seclusion — by an operation that knew its process routinely reaches non-debtors and had published a workflow for the wrongly contacted rather than a procedure to avoid contacting them. And Defendants had nothing legitimate on their side of the scale. A creditor pursuing its own debtor exercises a recognized interest; these Defendants had no debt owed by Plaintiff, no security, no relationship with him, and no lawful basis to contact him at all. Collection calls to a person who is not the debtor and is not secondarily liable are more disturbing, not less; pursuing a person to force payment of a debt he does not owe is precisely the intrusion Oklahoma law condemns. The repetition aggravates the offense; it is not its source.

147. Sentry, TrueAccord, and AT&T separately intruded upon Plaintiff's private affairs and concerns — his financial affairs, his identity, and his alleged debts. AT&T placed an alleged account bearing Plaintiff's name, with accompanying contact information, into an automated dunning operation; Sentry and TrueAccord held, processed, and transmitted to strangers Plaintiff's name, account, and balance through unauthenticated communications of the same design that exposed Everett D.'s account to Plaintiff. (¶¶ 62–65, 75–78.) That intrusion into Plaintiff's private financial affairs was nonconsensual and highly offensive to a reasonable person, and AT&T is additionally responsible as principal for the collection conduct of its agent on the account it placed. (¶¶ 17, 19, 65.) Willis is responsible for Tinker's placement of accounts and contact data into that operation. (¶ 16.)

148. The intrusions caused Plaintiff actual damages: the seventeen invasions of his solitude; the forced custody of a stranger's financial data; the exposure of his own; and the emotional distress, with physical manifestation, alleged at paragraphs 79 through 83. Under Oklahoma law, mental suffering from a willful invasion of a legal right is independently actionable, and severe emotional distress works a change in the nervous system that is itself physical injury.

149. Plaintiff is entitled to actual damages and to punitive damages under 23 O.S. § 9.1.

## PUNITIVE DAMAGES

*(As to Count XII — Invasion of Privacy)*

150. Plaintiff incorporates paragraphs 1 through 149.

151. Defendants acted intentionally and with malice toward others within the meaning of 23 O.S. § 9.1(C). From their own written admissions, from their own published terms designing for wrong-person contact, from repeated consumer complaints, and from repeated lawsuits, Sentry, TrueAccord, Neill, and Ravanesi knew that their automated system routinely demands payment from people who do not owe the debt and exposes consumers' account information through unauthenticated links — yet they continued the practice unchanged rather than perform the $0.008 verification that would stop it. (¶¶ 30–34, 47–56.)

152. The factors an Oklahoma jury weighs under 23 O.S. § 9.1(A) are present and aggravated here. The misconduct was profitable to Defendants, who found it cheaper to settle the few consumers who sue than to fix the practice; it was of extended duration and directed at the public at large — an operation working "25+

million accounts daily" by its own advertisement; Defendants were fully aware of the harm; and their response upon discovery, in complaint after complaint, was to acknowledge the error and continue the conduct. (¶¶ 47–56.) The response to Plaintiff himself completed the pattern: served with written notice and a draft complaint on July 29, 2026, and given verbal notice on their own recorded line on July 30, 2026, Defendants answered with canned collection messages about a different debt, refused Plaintiff's written questions, and closed every channel. (¶¶ 58–74.)

153. Because Defendants acted intentionally and with malice, punitive damages are warranted under 23 O.S. § 9.1(C) (Category II). Under that provision the jury may award the greatest of $500,000, twice the amount of actual damages, or the increased financial benefit derived by Defendants as a direct result of their misconduct. Plaintiff alleges that the increased financial benefit Defendants derive from foregoing number verification across the full volume of their automated collection campaigns — a per-query cost of $0.008, declined across an operation of twenty-five million accounts daily — and from pursuing accounts without regard to whether the recipient owes the debt, is the appropriate measure and substantially exceeds the other two.

154. Plaintiff seeks punitive damages against all Defendants in an amount to be determined at trial under 23 O.S. § 9.1(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants and the following relief:

a. Statutory damages of $500 per violation under the TCPA, 47 U.S.C. § 227(b)(3), trebled to $1,500 per violation for Defendants' willful and knowing violations;

b. Actual damages, statutory damages up to $1,000, and costs under the FDCPA, 15 U.S.C. § 1692k;

c. Actual damages and punitive damages for invasion of privacy, the punitive award to be determined under 23 O.S. § 9.1(C) (Category II);

d. A permanent injunction enjoining Defendants from further contacting Plaintiff, from transmitting Plaintiff's account information through unauthenticated links, and from the practices alleged herein;

e. Costs of this action; and

f. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 10th day of August, 2026.


Anthony Trupia, Pro Se
605 SE 21st St.
Oklahoma City, OK 73129
(516) 984-0142
Trupiaar@gmail.com